UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
                        :

INDIAN HARBOR INSURANCE COMPANY,  :

                        :

          Plaintiff,     :   Civil Case No. 24-cv-49

                        :

       v.            :   **COMPLAINT FOR**

                        :   **<u>DECLARATORY RELIEF</u>**

SWINERTON BUILDERS,         :

                        :

         Defendant.    :

                        :
----------------------------------------------------------X

      Plaintiff, Indian Harbor Insurance Company, by and through its attorneys, Duane Morris LLP, as and for its Complaint against Defendant, Swinerton Builders, hereby alleges as follows:

<u>NATURE OF ACTION</u>

      1.     This is an action for declaratory judgment pursuant to 28 U.S.C. sections 2201 and 2202 to determine the rights and duties, if any, between Indian Harbor Insurance Company ("IHIC") and its insured, Swinerton Builders ("Swinerton"), as set forth more fully below.  Such relief is requested due to the existence of an actual controversy between the parties.  IHIC contends an actual controversy exists as to its obligations to defend and indemnify Swinerton under the terms of a series of insurance policies that IHIC issued to Swinerton that are governed by New York law.  Specifically, IHIC seeks a declaration that it did not, and currently does not, have a duty to defend or indemnify Swinerton with respect to insurance claims arising from work performed by Swinerton and its subcontractors at a construction project known as the Cache Creek Hotel Expansion Project.

<u>PARTIES</u>

      2.     Plaintiff IHIC is, and at all times relevant herein was, a statutory insurance company domiciled in Delaware with its principal place of business in Stamford, Connecticut.

3.    On information and belief, Defendant Swinerton is a California corporation with its principal place of business located in Concord, California.

## JURISDICTION AND VENUE

4.    IHIC is not a citizen of the same state as Swinerton, and the matter in controversy exceeds the sum of $75,000, exclusive of interest, attorney's fees, and costs.  Therefore, this Court has jurisdiction pursuant to 28 U.S.C. section 1332.

5.    This Court is a proper venue for this action under 28 U.S.C. section 1391(b)(1) because Swinerton has consented to and is subject to personal jurisdiction in this District by agreement of the parties.  Specifically, the terms of the insurance policies that IHIC issued to Swinerton and that give rise to this action contain the following provision:

**7.F.    Choice of Law, Jurisdiction and Venue**

All matters arising hereunder including questions or disputes related to the validity, interpretation, performance and enforcement of this policy will be determined in accordance with the law and practice of the State of New York (notwithstanding New York's conflicts of law rules). It is agreed that in the event of our failure to pay any amount claimed to be due hereunder, we and you will submit to the jurisdiction of the State of New York and will comply with all the requirements necessary to give such court jurisdiction. Nothing in this clause constitutes or should be understood to constitute a waiver of our right to remove an action to a United States District Court.

## GENERAL ALLEGATIONS

### The Policies

6.    During the relevant period, IHIC issued four consecutive claims-made-and-reported Professional Activities/Complete Execution professional liability insurance policies to Swinerton Incorporated: (i) Policy No. CEO744604202 for the policy period of August 1, 2018 to August 1, 2019 ("18-19 Policy"); (ii) Policy No. CEO744604203 for the policy period of August 1, 2019 to August 1, 2020 ("19-20 Policy"); (iii) Policy No. CEO744604204 for the

policy period of August 1, 2020 to August 1, 2021 ("20-21 Policy"); and (iv) Policy No.

CEO744604205 for the policy period of August 1, 2021 to August 1, 2022 ("21-22 Policy").

True and correct copies of the foregoing insurance policies (together "Policies") are attached

hereto as Exhibit A (18-19 Policy), Exhibit B (19-20 Policy), Exhibit C (20-21 Policy), and

Exhibit D (21-22 Policy).

7.      Swinerton is identified as a "Named Insured" under each of the Policies.

8.      Each of the Policies has a maximum limit of liability of $15,000,000 per

Professional Liability claim, $15,000,000 per Protective Loss claim, and $15,000,000 in the

aggregate.  Each of the Policies' coverage for Professional Liability claims is subject to a

$500,000 per claim self-insured retention.

9.      Section 1.A of the Policies describes the scope of Professional Liability Coverage

as follows:

> We will pay on behalf of the **Insured** for **Professional Loss** which the **Insured**
> becomes legally obligated to pay because of a **Professional Liability Claim**
> resulting from a negligent act, error, or omission in **Professional Activities and
> Duties**, provided that:
>
> 1. the **Professional Liability Claim** arises out of **Professional Activities and
>    Duties** rendered on or after the **Retroactive Date** and prior to the expiration
>    of the **Policy Period**; and
>
> 2. the **Professional Liability Claim** is first made against the **Insured** during the
>    **Policy Period** and reported to us, in writing, during the **Policy Period** or,
>    where applicable, the Extended Reporting Period.

10.     Section 1.C of the Policies describes the scope of Protective Loss Coverage as

follows:

> We will indemnify the **Insured** for **Protective Loss** in excess of the **Design
> Professional's Insurance** resulting from a negligent act, error, or omission in
> **Design Professional Services** performed by a **Design Professional**, provided
> that:
>
> 1. the **Design Professional Services** are rendered on or after the **Retroactive
>    Date** and prior to the expiration of the **Policy Period**;

2. the **Protective Claim** is first made by the **Insured** against the **Design Professional** and reported by the **Insured** to us, in writing, during the **Policy Period** or, where applicable, the Extended Reporting Period; and

3. the **Insured** has taken all steps necessary to pursue the **Protective Claim** and obtain recovery of all **Protective Loss** from the **Design Professional** and the **Design Professional's Insurance**.

11.     Section 2 of the Policies sets forth the following definitions, among others:

| | | |
|---|---|---|
| **Design Professional** | **B.** | means any person or entity that is legally qualified, certified or licensed to perform services which are covered by **Design Professional's Insurance**, including subcontractors and subconsultants at any tier. |
| **Design Professional's Insurance** | **C.** | means all architects and engineers, or contractors professional liability insurance policies which insure a **Design Professional**. |
| **Design Professional Services** | **D.** | means services that any **Design Professional**: |

1. agreed to perform pursuant to a written contract with the **Insured**; and

2. which are included within the **Professional Activities and Duties** that the **Insured** agreed to perform in a written contract; and

3. which are covered by **Design Professional's Insurance**.

| | | |
|---|---|---|
| **Insured** | **E.** | means each of the following: |

1. The **Named Insured**; . . . .

| | | |
|---|---|---|
| **Legal Expense** | **F.** | means legal costs, charges, and expenses incurred in the investigation or defense of a **Professional Liability Claim** arising from **Professional Activities and Duties** provided such costs, charges and expenses are authorized by us. |

**Legal Expense** does not include the time and expense incurred by the **Insured** in assisting in the investigation or resolution of a **Professional Liability Claim** including, but not limited to, the costs of the **Insured**'s in-house counsel, salary charges of regular employees or officials of the Insured, and fees and expenses of counsel retained by the **Insured**.

**Legal Expense** also does not include salary charges of

4

our employees.

**Legal Expense** does not apply to **Rectification Expense** as set forth in Section 1: What We Cover nor to any legal costs or expenses incurred by the **Insured** in the investigation, prosecution, pursuit, adjustment, making or appeal of a **Protective Claim** against a **Design Professional**.

| | | |
|---|---|---|
| **Named Insured** | **G.** | means the person or entity listed in Item 1. of the Declarations and any other person or entity designated as a **Named Insured** by endorsement to this policy. |

*     *     *

| | | |
|---|---|---|
| **Professional Activities and Duties** | **J.** | means those activities whether part of, incidental to, or for which you have responsibility in your business as a construction contractor, construction manager, construction support services provider, or as stated in Sections 4. and 5. of the Application for this insurance policy executed by you, which are undertaken by or under the supervision of persons or personnel who have attained an appropriate professional qualification, certification or license, where applicable. |
| **Professional Liability Claim** | **K.** | means a monetary demand or notice, or assertion of a legal right alleging liability or responsibility on the part of the Insured and includes a lawsuit, petition, or governmental or regulatory action commenced against the Insured arising out of Professional Activities and Duties. |
| **Professional Loss** | **L.** | means any of the following arising out of **Professional Activities and Duties**: |

1. A monetary judgment, award, or settlement of compensatory damages;

2. Civil fines and penalties assessed against the **Insured**, but only where insurance coverage for such fines and penalties is allowable by law;

3. Civil fines and penalties assessed against a third party other than an **Insured** for which the **Insured** is legally liable, but only where insurance coverage for such fines and penalties is allowable by law;

4. Punitive, exemplary, or multiplied damages for

5

which the **Insured** is legally liable, but only where insurance coverage for such damages is allowable by law;

5. Liquidated damages, but only to the extent that the **Insured** would be legally liable in the absence of such agreement for liquidated damages; and

6. **Legal Expense** associated with Subsections L.1. through L.5. referenced above.

**Professional Loss** does not include: (a) injunctive or equitable relief; (b) the return of fees or charges for services rendered; or (c) any of the **Insured**'s overhead, mark-up or profit.

**Protective Claim**  M.  means a written demand made or lawsuit commenced by the **Insured** against a **Design Professional** alleging liability or responsibility on the part of the **Design Professional for Protective Loss** arising out of the **Design Professional's** rendering or failure to render **Design Professional Services**.

**Protective Loss**  N.  means the amount the **Insured** is legally entitled to recover from the **Design Professional** as determined by:

1. A final monetary judgment by a court of competent jurisdiction;

2. A final monetary award resulting from an arbitration or other dispute resolution proceeding, in which the **Insured** participates with our prior written consent; or

3. A settlement to which we agree in advance in writing.

\*        \*        \*

**Responsible Insured**  P.  means any officer, director, partner, member, manager, supervisor or foreman of the **Insured** or any employee of the **Insured** who has responsibility, in whole or in part, for risk control or risk management.

12.    Section 3 of the Policies is titled "WHAT WE DO NOT COVER" and provides, in relevant part, "We will not make any payment for a claim or costs directly or indirectly due to:":

    **A.**   *Known Circumstances or Conditions*: arising from:

        1.  a **Professional Liability Claim**, **Professional Loss**, **Protective Claim**, or **Protective Loss**, known by a **Responsible Insured** prior to the inception of the **Policy Period**; or

        2.  a circumstance or condition known by a **Responsible Insured** prior to the inception of the **Policy Period** where the **Responsible Insured** should have reasonably foreseen a **Professional Liability Claim**, **Professional Loss**, **Protective Claim**, **Protective Loss**, or **Rectification Expense** being incurred.

    **B.**   *Notices to Previous Insurers:* arising from any **Claim** or **Rectification Expense**, suit, negligent act, error, or omission, or other circumstance arising out of professional activities and duties reported by the **Insured** under any prior policy issued by a person or organization other than us or any entity affiliated with us.

          *     *     *

    **M.**  *Contractual Liability:* arising from the **Insured**'s:

        1.  assumption of liability in a contract or agreement; or

        2.  breach of contract or agreement.

    This exclusion does not apply to liability arising out of a negligent act, error or omission, and that the **Insured** would have in the absence of a contract or agreement.

    **N.**   *Express Warranties and Guaranties:* arising from any express warranty or guaranty.

    This exclusion does not apply to liability the **Insured** would have in the absence of such express warranty or guaranty.

13.     Section 5 of the Policies is titled "REPORTING, DEFENSE, SETTLEMENT AND COOPERATION" and provides, in relevant part:

*Duties of the Responsible Insured:*  **A.**  As a condition precedent to the coverage hereunder:

        1.  The **Responsible Insured** must notify us at the address set forth in the Declarations of each of the following, as soon as practicable:

        (a)  a **Claim**;

        (b)  a negligent act, error, or omission in **Professional Activities and Duties** or **Design Professional Services** which may result in a

7

**Claim** or **Rectification Expense**;

2.  The **Responsible Insured** must provide to us, whether orally or in writing, notice of the particulars the **Claim** including: (a) the date and details of all actual and alleged acts, errors or omissions in **Professional Activities and Duties** or **Design Professional Services** which took place, along with the specific nature, date and extent of any injury or damage which has been sustained; and (b) copies of any contracts that have been entered into by any **Insured** that are related to the **Professional Activities and Duties** or **Design Professional Services**; and (3) details explaining how the **Responsible Insured** first became aware of the **Claim**. . . .

B.  No costs, charges or expenses will be incurred, nor payments made, obligations assumed or remediation commenced or undertaken without our written consent which will not be unreasonably withheld.

*Our right and duty to defend you:*    C.  We have the right and the duty to defend any **Professional Liability Claim** against the **Insured** seeking **Professional Loss** to which this insurance applies, including the right to select counsel, even if any of the allegations are groundless, false or fraudulent. However, we have no duty to defend any **Professional Liability Claim** against the **Insured** to which this insurance does not apply. If we exercise such right set forth above, the **Insured**, on our demand, will promptly reimburse us for any payments made by us within the Self-Insured Retention Amount.

D.  The **Insured** will not admit liability or settle any **Claim** without our prior written consent. . . .

14.     Section 7 of the Policies is titled "CONDITIONS" and provides, in relevant part, as follows:

**Choice of Law, Jurisdiction and Venue**    F.  All matters arising hereunder including questions or disputes related to the validity, interpretation, performance and enforcement of this policy will be determined in accordance with the law and practice of the State of New York (notwithstanding New York's

conflicts of law rules). It is agreed that in the event of our failure to pay any amount claimed to be due hereunder, we and you will submit to the jurisdiction of the State of New York and will comply with all the requirements necessary to give such court jurisdiction. Nothing in this clause constitutes or should be understood to constitute a waiver of our right to remove an action to a United States District Court.

\*      \*      \*

**Other Insurance**      **L.**      Where other valid and collectible insurance is available to the **Insured**, in addition to **Design Professional's Insurance**, our obligations to the **Insured** are as follows:

1. This insurance is excess over any other valid and collectible insurance, whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise.

2. This insurance is excess over any other valid and collectible insurance available to the **Insured** under a project specific insurance policy, contractor-controlled insurance program, owner-controlled insurance program, consolidated (wrap-up) insurance program or any other similar insurance or program, whether such other insurance or program is stated to be primary, contributory, excess, contingent or otherwise.

3. This insurance is excess over any other valid and collectible **Design Professional's Insurance** whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise.

**The Project**

15.      Swinerton is a construction company.

16.      Swinerton served as the original general contractor for the Cache Creek Hotel Expansion Project, *i.e.*, the construction of a 459-room addition to the Cache Creek Hotel and Resort located at 14455 State Highway 16, in Brooks, California ("Project").  Cache Creek Casino Resort, an enterprise of the Yoche Dehe Wintun Nation, a federally recognized tribal

9

government, was and is the owner of the Project ("Owner").

17.     On or about April 24, 2017, Swinerton entered into Guaranteed Maximum Price Construction Agreement with the Owner in connection with Swinerton's general contractor role on the Project.  On or about May 21, 2018, Swinerton and the Owner entered into a GMP Amendment To Guaranteed Maximum Price Construction Agreement (as amended, "Agreement").

18.     Among others, Swinerton retained the following six subcontractors to perform work at the Project: (i) plumbing and mechanical subcontractor Air Systems Service & Construction, Inc. ("ASSC"); (ii) tile, stone and quartz subcontractor Fischer Tile & Marble ("Fischer"); (iii) structural steel and metal decks subcontractor JD2, Inc. ("JD2"); (iv) insulation subcontractor Performance Contracting ("PCI"); (v) electrical subcontractor Rex Moore Group, Inc. ("RMG"); and (vi) wall-covering subcontractor Valdez Painting, Inc. ("Valdez", and, together with ASSC, Fischer, JD2, PCI and RMG, "Subcontractors").

19.     Of the six Subcontractors, ASSC qualifies as a Design Professional under the Policies because ASSC is an "entity that is legally qualified, certified or licensed to perform services which are covered by **Design Professional's Insurance**."  ASSC performed services covered by Design Professional's Insurance as that term is defined by the Policies.

**The PVC Claim and VRF Claim**

20.     Prior to the execution of the Agreement, the Owner asked Swinerton to submit Value Engineering proposals to help lower the cost of the work on the Project.  In response, Swinerton submitted several Value Engineering proposals to the Owner that the Owner ultimately accepted and approved.

21.     One Value Engineering proposal that Swinerton prepared in consultation with

ASSC concerned a design change to a portion of the Project's plumbing waste lines from cast iron to PVC ("PVC Proposal").

22.    A second Value Engineering proposal that Swinerton prepared in consultation with ASSC concerned a design change to the Project's HVAC system from a four-pipe system to a variable refrigerant flow system ("VRF Proposal").

23.    The Owner approved both the PVC Proposal and the VRF Proposal. Each proposal was incorporated into the Agreement.

24.    The Agreement established March 28, 2019 as the substantial completion date for the Project. The Project was not substantially completed by that date, however, partly because of building code issues presented by the PVC Proposal and VRF Proposal, the resolution of which resulted in delays and cost overruns on the Project.

25.    On or about May 17, 2018, the building code inspector at the Project found that the PVC Proposal was not code-compliant because the PVC posed a fire hazard.

26.    On June 8, 2018, the Fire Chief having jurisdiction over the Project recommended the removal of PVC that had been installed at the Project pursuant to the PVC Proposal.

27.    On June 11, 2018, a Swinerton Project Executive emailed ASSC concerning the PVC Proposal, stating: "The Owner has determined that the PVC waste system material currently installed for Level H1 is unacceptable and is to be replaced with cast iron. Air Systems is directed to proceed with this work at this time."

28.    On July 17, 2018, the same Swinerton Project Executive emailed ASSC concerning the PVC Proposal, stating: "Air Systems proposed a value engineering option that clearly did not meet building code requirements at the time the VE was offered." The communication continued: "As things currently stand, Air Systems is responsible for all costs

associated with the PVC material issue including cost impacts to other trades and potential liquidated damages."

29.     The author of the foregoing June 11 and July 17, 2018 communications is a "Responsible Insured" as defined under the 18-19 Policy because, at the relevant time, such author was an "officer, director, partner, member, manager, supervisor or foreman of the **Insured**."

30.     On August 1, 2018, IHIC issued the 18-19 Policy to Swinerton.

31.     On October 2, 2018, the Owner sent a letter to Swinerton, care of its Vice President and Division Manager, concerning the PVC Proposal, stating:

> Swinerton and its Subcontractor, ASSC, are solely responsible for the PVC Proposal and the consequences of the PVC Proposal violating applicable Laws [including] . . . for the costs and impacts associated with correcting all resulting nonconformances in the Work. . . . Owner hereby demands that Swinerton submit a recovery plan to fully recover any schedule impacts associated with the PVC Proposal and ultimate determination that PVC is prohibited for use on the Project. . . . Owner fully reserves and retains all of its rights, remedies, positions, claims and defenses pursuant to the Agreement and under applicable law.

32.     The foregoing October 2, 2018 communication concerning the PVC Proposal is a "Professional Liability Claim" under the 18-19 Policy because it "a monetary demand or notice, or assertion of a legal right alleging liability or responsibility on the part of the **Insured** . . . arising out of **Professional Activities and Duties**," *i.e.*, arising out of "those activities whether part of, incidental to, or for which [Swinerton has] responsibility in [its] business as a construction contractor, [or] construction manager . . . which are undertaken by or under the supervision of persons or personnel who have attained an appropriate professional qualification, certification or license." Such Professional Liability Claim is referred to herein as the "PVC Claim."

33.     Based on the contentions in the aforementioned June 11 and July 17, 2018 communications, Swinerton and its Responsible Insured knew of, or should have reasonably foreseen, Swinerton's and ASSC's liability or responsibility for the PVC Claim by no later than October 2, 2018.

34.     On December 10, 2018, the Owner's architect sent Swinerton a Notice of Non-Conformance concerning the VRF Proposal, stating: "Contractor design and installation of the VRF system does not conform with the Contract Documents, details provided in attached letter." The letter attached to the foregoing Notice of Non-Conformance identified, among other things, uncertainty concerning how the VRF Proposal "is intended to meet the requirements of the Code."

35.     On March 11, 2019, the Owner sent a letter to Swinerton, care of its Vice President and Division Manager, concerning the VRF Proposal, stating:

> as Owner has repeatedly communicated to Swinerton, if Swinerton and/or ASSC do not develop a modification to the existing VRF system that (a) complies with all Laws, including the applicable codes, standards and AHJ requirements that the parties agreed to in the Agreement, (b) does not present a life-safety risk, and (c) is certified by LG as compatible with the installed equipment, then Swinerton and ASSC must, at their sole cost and expense, take all steps necessary to bring the VRF system into compliance with the Contract Documents.

36.     On April 5, 2019, the Owner sent a letter to Swinerton, care of its Vice President and Division Manager, concerning the VRF Proposal, stating:

> Owner hereby informs Swinerton that Architect, the Mechanical Engineer of Record (NV5), and AHJs have reviewed the information Swinerton and ASSC have provided regarding the VRF system installed at the Project and, based upon such information, have concluded unanimously that the installed VRF system does not comply with applicable Laws, including CMC 2013 and ASHRAE 15.   Accordingly, Owner hereby directs Swinerton, at Swinerton's sole cost and expense, to take all steps

necessary to bring the VRF system for the Project into compliance with the approved Contract Documents. A CCD memorializing Owner's direction in this regard is attached hereto as Attachment 1.

Owner fully reserves and retains all of its rights, remedies, positions, claims and defenses pursuant to the Agreement and under applicable law.

37.     The foregoing April 5, 2019 communication concerning the VRF Proposal annexed a CCD – or Construction Change Directive – identified as "DIRECTIVE NUMBER 006" and addressed to Swinerton. The CCD "direct[ed]" Swinerton to "[t]ake all necessary action to bring the VRF system for the Project into compliance with the Agreement and relevant Contracts."

38.     The foregoing April 5, 2019 communication concerning the VRF Proposal, inclusive of the annexed CCD, is a "Professional Liability Claim" under the 18-19 Policy because it "a monetary demand or notice, or assertion of a legal right alleging liability or responsibility on the part of the **Insured** . . . arising out of **Professional Activities and Duties**," *i.e.*, arising out of "those activities whether part of, incidental to, or for which [Swinerton has] responsibility in [its] business as a construction contractor, [or] construction manager . . . which are undertaken by or under the supervision of persons or personnel who have attained an appropriate professional qualification, certification or license." Such Professional Liability Claim is referred to herein as the "VRF Claim."

39.     The recipient of the foregoing October 2, 2018, March 11, 2019 and April 5, 2019 communications is a "Responsible Insured" as defined under the 18-19 Policy because, at the relevant time, such recipient was an "officer, director, partner, member, manager, supervisor or foreman of the **Insured.**"

40.     Upon receipt of the April 5, 2019 communication, Swinerton directed ASSC to

remove and replace the equipment installed on the Project pursuant to the VRF Proposal.  Based on the contentions in the April 5, 2019 communication with respect to ASSC, Swinerton and its Responsible Insured knew of, or should have reasonably foreseen, Swinerton's and ASSC's liability or responsibility for the VRF Claim by no later than April 2019.

41.    Swinerton, through its Vice President and Division Manager, responded to the Owner's April 5, 2019 communication on April 15, 2019, disputing responsibility for any issues relating to the VRF Proposal.  Instead, Swinerton contended that the Owner should be responsible for costs and delays attributable to the VRF issues identified by the Owner, including the costs necessary to comply with the CCD annexed to the April 5, 2019 communication.

42.    By e-mail dated June 13, 2019 to Swinerton's Project Executive and to its Vice-President and Division Manager, the Owner "reiterate[d]" its April 5, 2019 directive that Swinerton "take all steps necessary to bring the VRF system for the project into compliance with the approved Contract Documents."

43.    The Owner similarly communicated to Swinerton on June 17, 2019:

> Per the attached email the Owner has once again provided Swinerton formal direction to move forward with CCD 6. Swinerton's "Alternate VRF submittals" are therefore null and void. Swinerton is to take all steps necessary to bring the VRF system for the project into compliance with the approved Contract Documents as was previously directed via the Owner's letter on April 5, 2019.

44.    The foregoing PVC Claim and VRF Claim were first made against Swinerton no later than during the 18-19 Policy Period.

45.    On August 1, 2019, IHIC issued the 19-20 Policy to Swinerton.

46.    On August 16, 2019, Swinerton reported the VRF Claim to IHIC via an e-mail from Swinerton's insurance broker with the subject line "New Claim on Policy No.

CEO744604202."  This notice of the VRF Claim email stated: "We have a new claim to report on the above policy. **Date of Loss**: 4/15/2019 **Description**: Issues arising from value engineering of HVAC system.  **Location**: 14455 State Hwy 16, Brooks, CA 95606."

47.     Swinerton's foregoing reporting of the VRF Claim occurred 133 days or more after the Owner first made the VRF Claim against Swinerton.

48.     On August 21, 2019, an IHIC claim adjuster contacted Swinerton to acknowledge receipt of the notice of the VRF Claim.  In that communication, IHIC requested an opportunity to speak with Swinerton about the claim, and asked for documents to permit IHIC to assess the potential for coverage for the VRF Claim.  Swinerton did not respond to that communication or otherwise communicate with IHIC concerning the VRF Claim or the Project until January 2021, during the 20-21 Policy Period.

**The Arbitration and Additional Owner Claims**

49.     On November 19, 2019, Swinerton initiated an arbitration against the Owner before the American Arbitration Association, in a matter bearing AAA Case No. 01-19-0004-1349, seeking to recover damages for delays and for withheld payments at the Project ("Arbitration").

50.     On December 5, 2019, the Owner asserted a Counterclaim against Swinerton in the Arbitration.  The Owner's Counterclaim cited both the VRF Claim – which Swinerton had reported to IHIC – and the PVC Claim – which Swinerton had not reported to IHIC – as sources of delays on the Project to support the Owner's claim for liquidated damages in excess of $7 million.

51.     In addition to the VRF Claim and the PVC Claim, the Owner also supported its Counterclaim for liquidated damages with allegations that Swinerton: (i) began interior build-out

work before the Project was completely dried-in, which allegedly led to damages and Project delays following heavy rain on October 2 and 3, 2018 ("Rain Claim"); (ii) failed to properly coordinate work at the Project's Event Center, thus allegedly causing unnecessary rework and delays at the Project ("Event Center Claim"); and (iii) failed to budget for and otherwise prevent manpower shortages at the Project ("Manpower Claim").

52.    On information and belief, the Project's Builders Risk insurance company was placed on notice of the Rain Claim and ultimately contributed funds to compensate for losses flowing from the October 2 and 3, 2018 rain.

53.    Swinerton did not report to IHIC the existence of the Arbitration or of the Owner's December 5, 2019 Counterclaim until January 2021, during the 20-21 Policy Period.

54.    On January 10, 2020, the Owner terminated its Agreement with Swinerton, citing "over a year of communications between Owner and [Swinerton] relating to [Swinerton's] myriad breaches of the Agreement" which allegedly culminated in Swinerton's failure to "complete the Project in a timely, professional, and workmanlike manner. . . ."

55.    The Owner's January 10, 2020 termination notice to Swinerton stated the Owner would accept assignment of Swinerton's contracts with 34 subcontractors, including five of the Subcontractors identified above, *i.e.*, ASSC, Fischer, PCI, RMG and Valdez.

56.    On January 23, 2020, Swinerton e-mailed its Subcontractors concerning the Owner's termination of the Agreement.  Among other things, that e-mail stated:

> Swinerton shall require the following information from our Subcontractors in an effort to quickly as possible resolve all issues with [Owner] along with all internal issues amongst other Subcontractors and Swinerton. This information shall include the following: . . .  2. Any unsubmitted Claims for additional costs due to delays that are warranted per Article 14 of your Subcontract Agreement. 3. A copy of your current COR log (as of 1/10/2020) inclusive of all outstanding COR's, PCI's, claims, etc. . . .

57.     Consistent with Swinerton's request in the foregoing January 23, 2020 e-mail, each of the six Subcontractors submitted to Swinerton, by no later than May 2020, information supporting claims for additional compensation for work performed at the Project.

58.     In May 15, 2020, Swinerton submitted its Statement of Claims in the Arbitration articulating Swinerton's claimed entitlement to more than $62 million from the Owner. Swinerton's damages calculations included more than $16 million attributable to claims that Swinerton "has received or anticipates receiving a number of claims from" the six Subcontractors ("Subcontractor Claims").

59.     Swinerton did not report to IHIC the existence of any such Subcontractor Claims until September 2021, during the 21-22 Policy Period.

60.     Swinerton's May 15, 2020 Statement of Claims cited the aforementioned June 11, 2018 Owner e-mail concerning the PVC Claim, acknowledging that, through such e-mail, "the Owner ordered Swinerton to replace all PVC pipe with cast iron pipe per its original design."

61.     Swinerton's May 15, 2020 Statement of Claims also cited the aforementioned April 5, 2019 Owner letter concerning the VRF Claim, acknowledging that, through such letter, the Owner "instruct[ed] Swinerton to tear out installed VRF system and to install a VRF system based on NV5 design from Work Package #4 because the as-built system allegedly did not comply with" code requirements.

62.     Also on May 15, 2020, the Owner submitted an Amended Counterclaim in the Arbitration.  The Owner's Amended Counterclaim updated its claim against Swinerton for liquidated damages to approximately $10.5 million based on the same five categories of claims set forth in the original Counterclaim: PVC Claim, VRF Claim, Rain Claim, Event Center Claim and Manpower Claim.

63.    The Amended Counterclaim also sought additional damages from Swinerton attributable to nineteen separate categories of non-conforming/defective work that Swinerton allegedly failed to correct when notified by the Owner.

64.    Swinerton did not report the existence of the Owner's Amended Counterclaim to IHIC until January 2021, during the 20-21 Policy Period.

65.    On August 1, 2020, IHIC issued the 20-21 Policy to Swinerton.

66.    On December 24, 2020, the Owner filed a Second Amended Claim in the Arbitration.  The Owner's Second Amended Counterclaim updated its claim against Swinerton for liquidated damages to approximately $15.5 million based on the same five categories of claims set forth in its original and Amended Counterclaims: PVC Claim, VRF Claim, Rain, Claim, Event Center Claim and Manpower Claim.

67.    The Second Amended Counterclaim added new allegations concerning non-confirming/defective work performed by Swinerton, beyond the nineteen categories of defective work as alleged in the Amended Counterclaim.  Including the nineteen categories previously alleged, the Second Amended Counterclaim identified sixty-one alleged deficiencies in Swinerton's work, to which the Owner attributed almost $2.3 million in alleged damages after application of job reserves ("Defect Claims").

68.    On information and belief, the Defect Claims do not arise from "Professional Activities and Duties" as that term is defined in the Policies because they do not implicate work "undertaken by or under the supervision of persons or personnel who have attained an appropriate professional qualification, certification or license."  Instead, the Defect Claims relate to matters such as allegedly faulty painting, wallpaper application, and electrical work.

69.    Further, many if not all of the Defect Claims were asserted by the Owner against

Swinerton prior to Swinerton's termination from the Project. For example, issues with defective wallpaper were identified in January 2019.

70.    The Arbitration panel heard testimony in April and June of 2021.

71.    On August 17, 2021, the Arbitration panel issued an Interim Award addressing liability which found concurrent causation, *i.e.*, that Swinerton and the Owner were jointly responsible for the Project delays stemming from the PVC Proposal and the VRF Proposal.

**IHIC Coverage Determination of Owner Claims**

72.    On January 13, 2021, Swinerton, through its outside attorneys, transmitted a copy of the Owner's Second Amended Counterclaim to IHIC via e-mail and "tender[ed] its defense and indemnity" of said pleading.

73.    Swinerton's January 13, 2021 transmittal e-mail stated that the Owner's Second Amended Counterclaim "makes a series of claims against Swinerton, some of which are covered by the applicable Indian Harbor Professional Liability policy. Such covered claims include but are not limited to Cache Creek's claims of a failed PVC proposal and VRF system replacement."

74.    Swinerton's communications to IHIC concerning the Project in early 2021 were limited to the Counterclaims asserted against Swinerton by the Owner in the Arbitration. At that time, Swinerton did not report to IHIC the Subcontractor Claims nor any other disputes between IHIC and the Subcontractors.

75.    Swinerton did, however, report to IHIC in early 2021 that Swinerton's wrap general liability insurer Zurich American Insurance Company ("Zurich") was defending, subject to a reservation of rights, the Counterclaims that the Owner had asserted against Swinerton in the Arbitration.

76.    On March 25, 2021, IHIC issued a reservation of rights letter to Swinerton

("March 2021 ROR").

77.     The March 2021 ROR explained to Swinerton that IHIC was evaluating Professional Liability coverage for the 18-19 Policy, the 19-20 Policy and 20-21 Policy, but that IHIC was not evaluating Protective Loss coverage, which IHIC had determined was not implicated by the Owner's Counterclaims. Swinerton did not communicate to IHIC any disagreement with this determination.

78.     Through the March 2021 ROR, IHIC communicated to Swinerton that IHIC had declined Professional Liability coverage for the PVC Claim, the VRF Claim, the Rain Claim, the Event Center Claim, the Manpower Claim and the nineteen Defect Claims first asserted in the Amended Counterclaim.

79.     The March 2021 ROR cited several bases for IHIC's declination of Professional Liability coverage for such claims, including that: (i) Swinerton did not report the claims in the same Policy Period in which the claims were first made, as required by Section 1.A.2 of the Policies; and (ii) the Known Circumstances or Conditions exclusion in Section 3.A of the Policies barred coverage because Swinerton knew of the claims' existence, or knew of circumstances or conditions from which Swinerton reasonably should have foreseen the claims, prior to the Policy Period in which Swinerton reported them to IHIC. IHIC continues to stand by these coverage determinations.

80.     Through the March 2021 ROR, IHIC generally reserved the right to decline Professional Liability coverage for the PVC Claim, the VRF Claim, the Rain Claim, the Event Center Claim, the Manpower Claim and the nineteen Defect Claims first asserted in the Amended Counterclaim. IHIC also specifically reserved the right to decline Professional Liability coverage for such claims for several additional reasons, including: (i) that Swinerton

did not provide notice of such claims "as soon as practicable" as required by Section 5.A. of the Policies; (ii) to the extent that the claims do not arise from a "negligent act, error or omission in Professional Activities and Duties" rendered or that should have been rendered by Swinerton or "by any person for whose acts, errors, or omissions" Swinerton is legally responsible; (iii) to the extent that Swinerton previously reported the claims or any underlying circumstances to any other carrier under any prior policy, contrary to the Notice to Previous Insurers exclusion in Section 3.B of the Policies; and (iv) to the extent that the claims arose from "any express warranty or guaranty," such that coverage would be excluded under Section 3.N of the Policies.

81.    Based on Section 5.A. of the Policies, there is no coverage for the PVC Claim, the VRF Claim, the Rain Claim, the Event Center Claim, the Manpower Claim and the nineteen Defect Claims first asserted in the Amended Counterclaim based on Swinerton's delays of no less than 133 days in providing IHIC notice of such claims, which is not "as soon as possible."

82.    As to the remainder of the sixty-one Defect Claims that were not among the nineteen first asserted in the Owner's Amended Counterclaim, IHIC, through the March 2021 ROR, generally reserved rights to decline Professional Liability coverage.  IHIC also specifically reserved the right to decline Professional Liability coverage for such claims on the basis of, among other things, Sections 1.A.2, 3.A, 3.B, 3.N and 5.A of the 20-21 Policy, as well as on the basis that such claims do not arise from a "negligent act, error or omission in Professional Activities and Duties" rendered or that should have been rendered by Swinerton or "by any person for whose acts, errors, or omissions" Swinerton is legally responsible.

83.    With respect to the defense of the remainder of the sixty-one Defect Claims that were not among the nineteen first asserted in the Owner's Amended Counterclaim, IHIC communicated to Swinerton through the March 2021 ROR that, in addition to the foregoing

reservation of rights, IHIC took an excess position over (i) the 20-21 Policy's self-insured retention of $500,000; and (ii) the coverage afforded by Zurich by virtue of the "Other Insurance" provision in Section 7.L of the 20-21 Policy.  The March 2021 ROR thus communicated to Swinerton that IHIC maintained an excess position as to the defense of the Second Amended Counterclaim unless and until Swinerton established the exhaustion of the Self-Insured Retention and that no other insurer was defending it.

84.    On August 1, 2021, IHIC issued the 21-22 Policy to Swinerton.

85.    On August 16, 2021, Swinerton, through its outside attorneys, responded to IHIC's March 2021 ROR Letter.  Swinerton's responsive letter acknowledged that Swinerton reported the VRF Claim in a different Policy Period from which the claim was asserted against Swinerton.  In that letter, Swinerton asserted that California law required IHIC to show prejudice to invoke the claim-made-and-reported defense.  That is not an accurate statement of California law.  Moreover, New York law applies to the Policies per Section 7.F of the Policies, not California law.

86.    Swinerton's August 16, 2021 letter to IHIC did not address the Policies' Known Circumstances or Conditions exclusion.  Nor did the letter provide any update IHIC with respect to the status of Zurich's defense of Swinerton in the Arbitration.

**IHIC Coverage Determination of Subcontractor Claims**

87.    On September 9, 2021, Swinerton and the Owner settled the Arbitration. Pursuant to the terms of the settlement agreement, Swinerton assumed responsibility for all Subcontractor Claims, to the extent that they relate to costs incurred prior to the Owner's January 10, 2020 termination of the Agreement.

88.    On September 16, 2021, Swinerton, through its outside attorneys, communicated

to IHIC that, based on the Interim Award's partial attribution to Swinerton of fault for Project delays, Swinerton "expect[ed] subcontractor delay/cost claims to be asserted against Swinerton by subcontractors" including ASSC.  Swinerton's communication, which was made during the 21-22 Policy Period, did not report that the Subcontractor Claims had already been asserted against Swinerton by no later than May of 2020, *i.e.*, during the 19-20 Policy Period.

89.    On September 29, 2021, Swinerton, through its outside attorneys, communicated to IHIC that the September 9, 2021 settlement amount reflected a reduction in the Owner's contractual payment to Swinerton based on the Arbitration panel's attribution to Swinerton of partial responsibility for the VRF Claim and PVC Claim.  That September 29 communication stated that Swinerton intended to pursue ASSC to recover the foregoing reduction in payment and asked that IHIC "acknowledge coverage for this claim (to the extent not recovered against ASSC) and agree to fund our pursuit of ASSC for their share of this (covered) claim component."

90.    In the foregoing September 29, 2021 communication, Swinerton, through its outside attorneys, also stated that the September 9, 2021 settlement amount reflected a reduction in the Owner's contractual payment to Swinerton based on a portion of the Defect Claims, namely those claims relating to water leaks and defective products/installation.  Acknowledging that such claims were "not clearly stated in time and location and are not supported with clear cost documentation," Swinerton asked that IHIC "acknowledge coverage for those defect claims involving Swinerton's work under the supervision of licensed professionals."  In turn, Swinerton reported that it would be pursuing "our GL carrier for those claims that do not involve Swinerton's work under the supervision of licensed professionals."

91.    In the foregoing September 29, 2021 communication, Swinerton, through its

outside attorneys, also asked IHIC to acknowledge coverage for Swinerton's attorneys fees incurred in defending against the VRF Claim and PVC Claim.  Swinerton did not specify which fees, if any, were not already covered by Zurich.

92.     On October 21, 2021, Swinerton, through its outside attorneys, transmitted to Indian Harbor "summaries of the Delay and Productivity Claims from subcontractors not involved in the VE issues" adding that such claims "were originally submitted to the owner during the project in the attached PCI format and again during the Phase 1 arbitration."  The October 21, 2021 communication summarized several of the Subcontractor Claims that were first asserted against Swinerton during the 19-20 Policy Period.

93.     In November and December of 2021 during the 21-22 Policy Period, Swinerton formally tendered to IHIC for Professional Liability defense and indemnity coverage: (i) an ASSC contractual payment demand, (ii) arbitration demands by JD2 and Valdez, and (iii) a complaint filed by RMG.

94.     In connection with these Subcontractor Claim tenders, Swinerton provided IHIC with documents demonstrating that, by no later than September 19, 2020, Swinerton had tendered its defense and indemnity to ASSC concerning the VRF Claim and PVC Claim, asserting that ASSC bore substantial responsibility for such claims.  Although Swinerton did not request Protective Loss coverage in connection with that September 19, 2020 tender when it was transmitted to IHIC, such tender constitutes a Protective Claim under the Policies because it is a "written demand made . . . by the **Insured** against a **Design Professional** alleging liability or responsibility on the part of the **Design Professional** for **Protective Loss** arising out of the **Design Professional's** rendering or failure to render **Design Professional Services**."  The claim is referred to herein as the "ASSC Protective Claim."

95.     By letter dated January 19, 2022, IHIC declined coverage for the foregoing Subcontractor Claims asserted by ASSC, JD2, Valdez and RMG ("January 2022 ROR").

96.     Through the January 2022 ROR, IHIC generally reserved the right to decline Professional Liability coverage for such Subcontractor Claims.  IHIC also specifically declined Professional Liability coverage for such claims on the grounds that: (i) Swinerton did not report the claims in the same Policy Period in which the claims were first made, as required by Section 1.A.2 of the Policies; (ii) the Known Circumstances or Conditions exclusion in Section 3.A of the Policies barred coverage because Swinerton knew of the claims' existence, or knew of circumstances or conditions from which Swinerton reasonably should have foreseen the claims, prior to the 21-22 Policy Period in which Swinerton reported them to IHIC; and (iii) the Contractual Liability exclusion in Section 3.M of the Policies barred coverage because the claims sounded in contract and not professional negligence.  IHIC continues to stand by these coverage determinations.

97.     In the January 2022 ROR, IHIC also declined indemnity coverage for all Defect Claims on the grounds that, notwithstanding the September 9, 2021 Arbitration panel's Interim Award, Swinerton had provided no evidence that the Defect Claims constitute Professional Claims covered under any of the Policies, irrespective of when such claims were first made against Swinerton.  Swinerton still has provided no such evidence and IHIC continues to stand by this coverage determination.

98.     As to defense coverage for the Defect Claims first asserted in the Second Amended Counterclaim, the January 2022 ROR reminded Swinerton that it bears the burden of establishing that: (i) Swinerton had incurred defense costs in connection with the Defect Claims in excess of the 20-21 Policy's $500,000 Self-Insured Retention; (ii) Zurich's CGL policy did

not cover such Defect Claims; (iii) such Defect Claims alleged professional negligence so as to constitute Professional Liability Claims under the 20-21 Policy; and (iv) such Defect Claims were first asserted against Swinerton during the 20-21 Policy.  IHIC also reiterated its prior reservation of rights concerning such claims, and asked Swinerton for information concerning the foregoing facts to enable IHIC to assess defense coverage.  Swinerton has never provided any of the requested information.

99.    Defense coverage for the Defect Claims first asserted in the Second Amended Counterclaim is not available under the Policies.  To the extent that Zurich did not provide a defense of the Defect Claims during the pendency of the Arbitration, then Swinerton had the responsibility to let IHIC know that circumstances had changed and to seek IHIC's consent for the defense costs Swinerton sought to have IHIC pay.  Swinerton's failure to notify IHIC renders any expenses incurred by Swinerton without IHIC's consent unrecoverable pursuant to Section 5.B of the 20-21 Policy.

100.    On April 6, 2022, Swinerton tendered to IHIC the Subcontractor Claims that were first asserted by PCI and Fischer during the 19-20 Policy Period.  On June 13, 2022, Swinerton transmitted the pleadings concerning such Subcontractor Claims, as well as pleadings concerning the other four Subcontractor Claims, including pleadings from proceedings initiated by Swinerton against the Subcontractors.

101.    By letter dated August 9, 2022, IHIC communicated to Swinerton that it had declined coverage for the PCI and Fischer Subcontractor Claims, reiterated its declination of coverage for all Subcontractor Claims, and reiterated its general reservation of rights to decline coverage for such claims.

102.    IHIC's August 9, 2022 letter explained the following reasons for declining

Professional Liability coverage for the Subcontractor Claims: (i) Swinerton did not report the claims in the same Policy Period in which the claims were first made, as required by Section 1.A.2 of the Policies; (ii) the Known Circumstances or Conditions exclusion in Section 3.A of the Policies barred coverage because Swinerton knew of the claims' existence, or knew of circumstances or conditions from which Swinerton reasonably should have foreseen the claims, prior to the Policy Period in which Swinerton reported them to IHIC; and (iii) the Contractual Liability exclusion in Section 3.M of the Policies barred coverage because the claims sounded in contract and not professional negligence.  IHIC continues to stand by these coverage determinations.

103.    In its August 9, 2022 letter, IHIC also advised Swinerton that it was declining Professional Liability coverage for the Fischer claim on the ground that Fischer had not alleged any "negligent act, error, or omission in **Professional Activities and Duties**" so as to support Professional Liability coverage.  IHIC continues to stand by this coverage determination.

**IHIC Coverage Determination of ASSC Protective Claim**

104.    On March 17, 2023, Swinerton filed a lawsuit against IHIC in the Northern District of California asserting that it was entitled to Professional Liability coverage in relation to the defense and indemnity of the Arbitration and the Subcontractor Claims ("California Lawsuit").  Swinerton did not assert any claims for Protective Loss coverage in the California Lawsuit.

105.    On June 16, 2023, Swinerton and IHIC executed a Dismissal, Forbearance, and Tolling Agreement, pursuant to whose terms Swinerton dismissed the California Lawsuit without prejudice.

106.    Among other things, the parties agreed in the Dismissal, Forbearance, and Tolling

Agreement that neither party would file a lawsuit against the other concerning coverage under the Policies relating to the Project until at least thirty days after the termination of said Dismissal, Forbearance, and Tolling Agreement. The parties' agreement did not limit where either party could file suit after such period expired.

107. On June 26, 2023, Swinerton, through its outside attorneys, invited IHIC to participate in the upcoming ASSC mediation. Swinerton's communication demanded for the first time that IHIC extend Protective Loss coverage to the ASSC Protective Claim in the event that the mediation resulted in a residual Protective Loss under the terms of the Policies.

108. By letter dated August 10, 2023, IHIC informed Swinerton that it had declined coverage for the ASSC Protective Claim. In addition to asserting a general reservation of rights, IHIC specifically declined Protective Loss coverage for the ASSC Protective Claim on the grounds that: (i) Swinerton did not report the claim in the same Policy Period in which the claim was first made, as required by Section 1.C.2 of the Policies; and (ii) the Known Circumstances or Conditions exclusion in Section 3.A of the Policies barred coverage because Swinerton knew of the claim's existence, or knew of circumstances or conditions from which Swinerton reasonably should have foreseen the claim, prior to the Policy Period in which Swinerton reported them to IHIC. IHIC continues to stand by this coverage determination.

109. In particular, Swinerton either reported the ASSC Protective Claim to IHIC on June 26, 2023 or, at the earliest, during the 21-22 Policy Period when it first tendered the defense and indemnity of ASSC's separate Subcontractor Claim against Swinerton. But the ASSC Protective Claim was first made at least one year earlier, during the 20-21 Policy Period when Swinerton first tendered the defense of the PVC Claim and VRF Claim to ASSC.

110. Further, Swinerton knew of, or should have reasonably foreseen, ASSC's liability

for the PVC Claim and VRF Claim long before the 21-22 Policy Period.  Indeed, the aforementioned communications from 2018 and 2019 reveal that ASSC was a party to communications concerning responsibility for the PVC and VRF issues.  As early as July 17, 2018, Swinerton told ASSC that it "is responsible for all costs associated with the PVC material issue including cost impacts to other trades and potential liquidated damages."

111.    In its letter dated August 10, 2023, IHIC also informed Swinerton that it reserved the right to decline Protective Loss coverage for the ASSC Protective Claim for several other reasons, including that such claim was not reported "as soon as practicable" or otherwise in the form required in Sections 5.A of the Policies as a condition precedent to coverage.  Insofar as Swinerton waited at least one year – if not five years – to report the ASSC Protective Claim to IHIC, coverage for such claim is also barred pursuant to Sections 5.A of the Policies.

112.    After Swinerton's mediation with ASSC in October 2023, Swinerton reported to IHIC that it had resolved all disputes with ASSC and it asked IHIC to contribute funds to resolve the ASSC Protective Claim.

113.    IHIC and Swinerton have been unable to resolve said claim or their disputes concerning coverage under the Policies relating to the Project generally.

114.    On December 5, 2023, Swinerton, through its outside attorneys, notified IHIC that it was terminating the Dismissal, Forbearance, and Tolling Agreement.  Because New York is the venue and law specified in the Policies, IHIC has filed this action in this Court.

115.    The foregoing disputes concerning coverage give rise to a live controversy supporting declaratory relief from this court.

**FIRST COUNT**

**(Declaratory Judgment – No Duty to Indemnify
Swinerton for Underlying Professional Liability Claims)**

116.     IHIC refers to and incorporates herein by reference paragraphs 1 through __ inclusive, as though set forth in full herein.

117.     IHIC contends that it is not obligated to indemnify Swinerton with regard to the PVC Claim, the VRF Claim, the Rain Claim, the Event Center Claim, the Manpower Claim, the Defect Claims or the Subcontractor Claims asserted against Swinerton (together, the "Underlying Professional Liability Claims") based on the terms, exclusions, conditions, and endorsements of the policy, including without limitation:

      a.     The failure of Swinerton to provide timely notice of the Underlying Professional Liability Claims;

      b.     The failure of Swinerton to report the Underlying Professional Liability Claims to IHIC during the same Policy Period in which the Underlying Professional Liability Claims were made against Swinerton;

      c.     Application of Exclusion A of the Policies concerning Known Circumstances or Conditions;

      d.     Application of Exclusion M of the Policies concerning Contractual Liability;

      e.     Application of Exclusion N of the Policies concerning Express Warranties; and

      f.     The Underlying Professional Liability Claims, in part, do not arise out of Professional Activities and Duties.

118.     Swinerton contends that there is coverage under the Policies for the Underlying

31

Professional Liability Claims.

119.    An actual controversy exists between IHIC, on the one hand, and Swinerton, on the other hand, that involves the rights and obligations of IHIC to any past, present or continuing duty to indemnify Swinerton with respect to the Underlying Professional Liability Claims.  This controversy is within the jurisdiction of this Court and can be resolved by a declaratory judgment of this Court and without the involvement of other suits.

120.    IHIC desires a judicial determination of its rights and duties with respect to IHIC's duty, if any, to indemnify Swinerton with respect to the Underlying Professional Liability Claims.  Specifically, IHIC desires a judicial declaration that IHIC does not have a duty to indemnify Swinerton with respect to the Underlying Professional Liability Claims for the foregoing reasons.

## **SECOND COUNT**

### **(Declaratory Judgment – No Duty to Defend Swinerton for Underlying Professional Liability Claims)**

121.    IHIC refers to and incorporates herein by reference paragraphs 1 through __ inclusive, as though set forth in full herein.

122.    IHIC contends that it is not obligated to defend Swinerton with regard to the Underlying Professional Liability Claims based on the terms, exclusions, conditions, and endorsements of the policy, including without limitation:

   a.    The failure of Swinerton to provide timely notice of the Underlying Professional Liability Claims;

   b.    The failure of Swinerton to report the Underlying Professional Liability Claims to IHIC during the same Policy Period in which the Underlying Professional Liability Claims were made against Swinerton;

      c.     The failure of Swinerton to seek and obtain IHIC's consent to incur the expenses purportedly attributable to the Underlying Professional Liability Claims;

      d.     Application of Exclusion A of the Policies concerning Known Circumstances or Conditions;

      e.     Application of Exclusion M of the Policies concerning Contractual Liability;

      f.     Application of Exclusion N of the Policies concerning Express Warranties;

      g.     The Underlying Professional Liability Claims, in part, do not arise out of Professional Activities and Duties; and

      h.     Application of the self-insured retention(s) of the Policies.

123.    Swinerton contends that there is coverage under the Policies for the Underlying Professional Liability Claims, as well as the amounts it has spent relating to the Underlying Professional Liability Claims.

124.    An actual controversy exists between IHIC, on the one hand, and Swinerton, on the other hand, that involves the rights and obligations of IHIC to any past, present or continuing duty to defend Swinerton with respect to the Underlying Professional Liability Claims.  This controversy is within the jurisdiction of this Court and can be resolved by a declaratory judgment of this Court and without the involvement of other suits.

125.    IHIC desires a judicial determination of its rights and duties with respect to IHIC's duty, if any, to defend Swinerton with respect to the Underlying Professional Liability Claims.  Specifically, IHIC desires a judicial declaration that IHIC does not have a duty to defend Swinerton with respect to the Underlying Professional Liability Claims for the foregoing

reasons.

### **THIRD COUNT**

**(Declaratory Judgment – No Duty to Indemnify
Swinerton for ASSC Protective Loss Claim)**

126.    IHIC refers to and incorporates herein by reference paragraphs 1 through __

inclusive, as though set forth in full herein.

127.    IHIC contends that it is not obligated to indemnify Swinerton with regard to the

ASSC Protective Loss Claim based on the terms, exclusions, conditions, and endorsements of the

policy, including without limitation:

a.    The failure of Swinerton to provide timely notice of the ASSC Protective

Loss Claim;

b.    The failure of Swinerton to report the ASSC Protective Loss Claim to

IHIC during the same Policy Period in which Swinerton first asserted the ASSC Protective Loss

Claim against ASSC; and

c.    Application of Exclusion A of the Policies concerning Known

Circumstances or Conditions.

128.    Swinerton contends that there is coverage under the Policies for the ASSC

Protective Loss Claim.

129.    An actual controversy exists between IHIC, on the one hand, and Swinerton, on

the other hand, that involves the rights and obligations of IHIC to any past, present or continuing

duty to indemnify Swinerton with respect to the ASSC Protective Loss Claim.  This controversy

is within the jurisdiction of this Court and can be resolved by a declaratory judgment of this

Court and without the involvement of other suits.

130.    IHIC desires a judicial determination of its rights and duties with respect to

IHIC's duty, if any, to indemnify Swinerton with respect to the ASSC Protective Loss Claim. Specifically, IHIC desires a judicial declaration that IHIC does not have a duty to indemnify Swinerton with respect to the ASSC Protective Loss Claim for the foregoing reasons.

## PRAYER FOR RELIEF

WHEREFORE, IHIC prays for judgment as follows:

1.      That this Court determine and adjudicate the rights, duties and obligations of the parties with respect to the policies of insurance described in this Complaint, the Underlying Professional Liability Claims, and the ASSC Protective Loss Claim;

2.      On the First Count: for a judicial declaration that IHIC did not and does not have a duty to indemnify Swinerton against the Underlying Professional Liability Claims due to the terms, exclusions, conditions, and endorsements of the Policies, including without limitation:

        a.      The failure of Swinerton to provide timely notice of the Underlying Professional Liability Claims;

        b.      The failure of Swinerton to report the Underlying Professional Liability Claims to IHIC during the same Policy Period in which the Underlying Professional Liability Claims were made against Swinerton;

        c.      Application of Exclusion A of the Policies;

        d.      Application of Exclusion M of the Policies;

        e.      Application of Exclusion N of the Policies; and

        f.      The Underlying Professional Liability Claims, in part, do not arise out of Professional Activities and Duties.

3.      On the Second Count: for a judicial declaration that IHIC did not and does not have a duty to defend Swinerton against the Underlying Professional Liability Claims due to the

terms, exclusions, conditions, and endorsements of the Policies, including without limitation:

      a.     The failure of Swinerton to provide timely notice of the Underlying Professional Liability Claims;

      b.     The failure of Swinerton to report the Underlying Professional Liability Claims to IHIC during the same Policy Period in which the Underlying Professional Liability Claims were made against Swinerton;

      c.     The failure of Swinerton to seek and obtain IHIC's consent to incur the expenses purportedly attributable to the Underlying Professional Liability Claims;

      d.     Application of Exclusion A of the Policies;

      e.     Application of Exclusion M of the Policies;

      f.     Application of Exclusion N of the Policies;

      g.     The Underlying Professional Liability Claims, in part, do not arise out of Professional Activities and Duties; and

      h.     Application of the self-insured retention(s) of the Policies.

4.     On the Third Count: for a judicial declaration that IHIC did not and does not have a duty to indemnify Swinerton against the ASSC Protective Loss Claim due to the terms, exclusions, conditions, and endorsements of the Policies, including without limitation:

      a.     The failure of Swinerton to provide timely notice of the ASSC Protective Loss Claim;

      b.     The failure of Swinerton to report the ASSC Protective Loss Claim to IHIC during the same Policy Period in which the ASSC Protective Loss Claim was made against Swinerton; and

      c.     Application of Exclusion A of the Policies.

5.      For expenses and costs of suit incurred herein; and

6.      For such other and further relief as the Court deems just and proper under the

circumstances.

Dated: New York, New York
        January 4, 2024

                                DUANE MORRIS LLP

                                By: ____/s David T. McTaggart_____
                                        David T. McTaggart
                                1540 Broadway
                                New York, New York 10036-4086
                                Phone: (212) 471-1814
                                Fax: (212) 202-4931
                                Email: dtmctaggart@duanemorris.com

                                -and-

                                Max H. Stern, Esq.
                                *Pro Hac Vice* Admission Pending
                                DUANE MORRIS LLP
                                Spear Tower
                                One Market Plaza, Suite 2200
                                San Francisco, California 94105-1127

                                *Attorneys for Plaintiff*
                                *Indian Harbor Insurance Company*